UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| RUSSELL ERNEST BOYD, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Cause No.: 3:09-CV-537 |
| CORRECTIONAL MEDICAL SERVICES, INC., MICHAEL MITCHEFF, DR. RACHEL L. ROSS, DEANA JORDAN, BARBARA BRUBAKER, and HARRIET WOOLEVER, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by the defendants on September 15, 2011 (docket at 80). The defendants also filed a memorandum in support of the motion (docket at 82). The plaintiff filed a response in opposition to the motion on August 9, 2012 (docket at 109).[1] The defendants filed a reply brief on August 29, 2012 (docket at 110).[2] For the reasons discussed below, the motion is GRANTED and this case is

---

[1] The exceedingly long delay between the filing of the motion for summary judgment and the plaintiff's response was the result of plaintiff's five requests for extensions of time in which to file his response. Because the plaintiff was incarcerated in the Indiana Department of Corrections and is proceeding *pro se*, those motions were granted. The motion is now, finally, ripe for resolution.

[2] In their reply brief, the defendants argue that Boyd's response brief "must be disregarded by this Court[.]" since it was filed on August 9, 2012–one day past the deadline that was set after Boyd filed his fifth motion for extension of time in which to file his response. The defendants did not file a motion to strike the response, but merely ask that it not be considered (and, consequently, that their motion for summary judgment be considered unopposed). However, Boyd's response brief includes a Certificate of Service indicating that he served it on the defendants "by depositing the same in the United States mail, first class postage affixed, this 6th day of August, 2012." Plaintiff's Response, p. 29. The certificate of service on his response, if correct (and defendants do not argue that it is not), would make it timely under the "mailbox"

DISMISSED.

## APPLICABLE STANDARDS OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c)(2). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

Also in this case, the Court must be mindful of the fact that Boyd is proceeding *pro se*. In examining the evidence, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1453 (7th Cir. 1994). In

---

rule established in *Houston v. Lack,* 487 U.S. 266 (1988). This rule provides that a prisoner's submissions to the court are to be deemed as "filed" on the date he delivers it to prison authorities for forwarding to the district court. *See also, Suiter v. VanNatta,* 2008 WL 820286 at *2 (N.D.Ind. 2008). Even if Boyd could have used greater diligence to ensure that his response was received by August 8, the Court is not inclined to impose the harsh sanction defendants request–ignoring Boyd's response brief–for this minor infraction.

undertaking this analysis, *pro se* pleadings are "to be liberally construed ." *Erickson v. Pardus,* 551 U.S. 89 (2007) (citation and quotation omitted); *Anderson v. Hardman,* 241 F.3d 544, 545 (7th Cir. 2001).

## DISCUSSION

Virtually all of the material facts underlying this case are undisputed. The issue in the case is whether those facts support plaintiff's argument that the defendants failed to adequately address his serious medical condition while he was incarcerated at the Westville Correctional Facility–a facility within the Indiana Department of Corrections. Boyd was housed at Westville beginning May 1, 2007. In this case, Boyd alleges that the "defendants did knowingly and intentionally violate his constitutionally protected rights as set forth in the Indiana State Constitution (Article I, § 16), and the United States Constitution (Eighth Amendment)." Plaintiff's Response, p. 2. Boyd contends that he suffered from a serious eye condition and that defendants failed to provide adequate medical care. *Id*., generally. The defendants are: 1) Correctional Medical Services, Inc. ("CMS"), a corporate entity that contracts with the Indiana Department of Corrections to manage health services provided to inmates; 2) Dr. Michael Mitcheff, Regional Medical Director for CMS; 3) Dr. Rachael L. Ross, the treating physician at the Westville Facility; 4) Deana Jordan, the Director of Nursing at Westville; 5) Barbara Brubaker, a nurse practitioner at Westville; and 6) Harriet Woolever, the medical secretary at Westville. Boyd alleges that each of these defendants demonstrated deliberate indifference to his serious medical condition.

More specifically, Boyd alleges "[t]hat the defendants, individually and collectively, are responsible for at least three (3) lengthy delays in providing Boyd timely and meaningful

3

medical care regarding his right eye and the numerous retinal detachments and tears." *Id.*, p. 2. The defendants argue that "they sent [Boyd] to see an eye specialist on **19** occasions in 15 months, prescribed medicated eye drops for him, and he had multiple procedures on his eyes[.]" Defendant's Memorandum in Support of their Motion for Summary Judgment, p. 1 (emphasis in original).

The issue before the Court then, is whether the medical treatment the defendants provided to Boyd was adequate or whether it was so lacking that it rises to the level of deliberate indifference. To support an 8th Amendment claim for inadequate medical treatment, a plaintiff carries a heavy burden of proof. A violation of the Eighth Amendment's cruel and unusual punishments clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Wilson v. Seiter,* 501 U.S. 294 (1991). In medical cases, the Eighth Amendment test is expressed in terms of whether the defendant was deliberately indifferent to the plaintiff's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997).

"Under the Eighth Amendment, [a plaintiff] is not entitled to specific care ... [or] ... entitled to the best possible care." *Forbes v. Edgar,* 112 F.3d 262, 267 (7th Cir. 1997). Negligence or medical malpractice do not constitute deliberate indifference, *Estelle v. Gamble,* 429 U.S. at 106, and a mere disagreement with a physician over a course of medical treatment states no claim under § 1983. *Brownlow v. Chavez,* 871 F.Supp. 1061, 1064 (S.D.Ind. 1994). Even medical malpractice and incompetence state no claim of deliberate indifference. *Walker v. Peters,* 233 F.3d 494 (7th Cir. 2000).

In this case, the issue is not whether Boyd had a serious health condition. He suffered from pain in his right eye, ended up with a detached retina, required surgery to repair it, and was rendered legally blind. The issue is whether the care given to Boyd by the defendants was so inadequate that it constituted deliberate indifference. More specifically, for present purposes, the issue is whether there is a fact issue or issues concerning deliberate indifference that require a trial.

When Boyd entered the Westville facility on May 1, 2007, he was designated to the facility's Chronic Care Center since he suffered from high blood pressure. Defendants' Memorandum, p. 3. As a result of that designation, he was seen at least every 12 weeks so his high blood pressure could be monitored and/or treated. *Id*. On June 4, 2007, defendant Brubaker examined Boyd in the Chronic Care Center. *Id*. She also ordered Boyd's medical records from the county jail where he was housed before going to Westville, since he indicated that he had suffered a head injury in the jail. *Id.; see also*, Defendants' Designation of Evidence, docket at 81, Exhibit B, Affidavit of Barbara Brubaker, ¶ 5. He also was examined by the prison eye doctor and was given a prescription for eyeglasses. *Id*. It is undisputed that Boyd was not

5

complaining of eye pain at that point in time. On July 23, 2007, Boyd was again examined by Nurse Brubaker since he was complaining of dizziness. Exhibit B, ¶ 6. Boyd told Brubaker that he had been suffering from dizziness off and on for a long period of time. *Id*. Brubaker prescribed medication to treat the dizziness. *Id*. On September 8, 2007, Boyd was seen in the Clinic by Dr. Ross. Exhibit C, Affidavit of Dr. Ross, ¶ 4. Dr. Ross renewed Boyd's medication to treat his dizziness and also ordered blood work. During this exam, Boyd conveyed to Dr. Ross that his dizziness began when he got hit in the head. *Id*. On September 20, 2007, Boyd had blood drawn pursuant to Dr. Ross's order. *Id*. On October 28, 2007, Ross examined Boyd again and he told her that he could not see out of the right side of his right eye for several days. *Id*., ¶ 5. According to the defendants, "[t]his was the first time Mr. Boyd complained of eye problems." Defendants' Memorandum, p. 4. However, Boyd takes issue with this statement. In his own affidavit, Boyd states that "on the 16th day of October, 2007, while housed at . . . Westville . . . I woke up with extreme pain in and around my right eye, and that I was experiencing a large black spot in the visual field of my right eye. That I immediately got on the call box (intercom system) in my cell and immediately sought medical assistance from the facility medical unit. That medical staff, through the unit correction officers, informed me that per Correctional Medical Services . . . policy and procedures, I would have to submit a Health Care Request Form . . . in order to have my medical issue addressed by health care staff." Affidavit of Russell Boyd, docket at 109-2, ¶¶ 4-5. Boyd also states that he was able to get the attention of a nurse while she was delivering medication to inmates in his unit and was "able to explain to her what was going on with my eye, however, nothing was done and I was not able to see a qualified health care provider in order to have a determination made as to what exactly

6

might be the reason for my medical problems. . ." *Id*., ¶ 6. Boyd does not say who that nurse was or when he complained to her. His statement implies that he complained to a nurse on the same day he complained to the guards, but that is not clear. In any event, Boyd concedes that he then saw Dr. Ross on October 28, 2007, for what he terms his "now two (2) week old medical problem that I was experiencing with my right eye." *Id*., ¶ 7. Boyd makes much out of the 12-day span between his complaint to guards (and perhaps a nurse) and his examination with Dr. Ross. But he presents no evidence whatsoever that any of the defendants were responsible for this delay. Confinement officers told him he needed to fill out a Health Care Request Form before he could be seen at the Clinic and an unnamed nurse apparently did not take the steps Boyd thinks she should have taken to ensure that he was seen by Dr. Ross sooner. Thus, this delay in getting an examination scheduled with Dr. Ross, while unfortunate, does not state a claim of deliberate indifference on the part of any defendant.

Once Boyd complained to Dr. Ross on October 28, she took immediate action. She noted in Boyd's medical records that he "visual field deficit on right vf. [sic] decreased peripheral vision." Plaintiff's Designation of Evidence, docket at 109, Exhibit 2 (report by Dr. Ross dated October 28, 2007). She also ordered that Boyd be examined by the prison eye doctor and planned to order a CT scan of Boyd's head. *Id*. Ross later discussed her recommendation for a CT scan with Dr. Mitcheff, the Regional Medical Director. Ross Affidavit, ¶ 5; Defendants' Exhibit D, Affidavit of Dr. Mitcheff, ¶ 5. The defendants explain that "Dr. Mitcheff was familiar with [Boyd] , as he had been a treating prison physician prior to becoming Regional Medical Director. . . . Dr. Mitcheff suggested that Dr. Ross check Mr. Boyd's prior records to see if he had a prior CT scan, so they would have something to compare a new CT scan to. . . . If Dr. Ross

7

thought Mr. Boyd needed an immediate CT scan of the head, she could have sent him out for one regardless of Dr. Mitcheff's input." Defendants' Memorandum, p. 4; Ross Affidavit, ¶ 5; Mitcheff Affidavit, ¶ 5.

Boyd argues that Dr. Mitcheff's actions constitute another incident of deliberate indifference to his serious medical needs in that Dr. Mitcheff "did deny Dr. Ross' request for the C.T. Scan based on his belief that I had had such a procedure in the past." Boyd Affidavit, ¶ 8. However, the affidavits of Drs. Ross and Mitcheff make clear that Mitcheff was not denying or disallowing a CT scan. Instead, he merely indicated to Dr. Ross that she should check to see if a prior scan was available for review. Furthermore, it is undisputed that Dr. Mitcheff was not personally involved in examining or treating Boyd in any other manner. In his affidavit, Dr. Mitcheff explains that "[a]s Regional Medical Director, I had no personal involvement with Mr. Boyd's medical treatment for his eye problems. The only involvement I had with Mr. Boyd's treatment was to receive Dr. Ross' recommendation for a CT scan of the head and discuss with her that it would be prudent to determine whether Mr. Boyd had a prior CT scan first, to compare a new one to. The only other time I had any involvement with Mr. Boyd's medical care was to review the prison doctor and nurse practitioner's recommendations to send Mr. Boyd to specialists for his eye problems." Mitcheff Affidavit, ¶ 7. Dr. Mitcheff further states that "[a]s Regional Medical Director, I do not treat offenders. I review recommendations from prison physicians for non-formulary medications, or referrals to specialists or outside hospitals for testing or treatment. I do not approve or deny these recommendations, but review them to confirm whether they meet applicable insurance criteria and at times I will suggest alternative treatment options. The treating physician at the prison always has the authority to do what is

8

medically necessary for the patient, regardless of my input or suggestions."

Again, it is undisputed that Dr. Mitcheff did not personally examine or treat Boyd. His involvement in Boyd's medical care was limited to a discussion and recommendation to Dr. Ross concerning the CT scan. Furthermore, as the defendants point out in their memorandum, Boyd's assertion that Dr. Mitcheff "denied" his CT scan is nothing more than an assumption on Boyd's part, which is not supported by any evidence. The facts in this case do not support any claim of deliberate indifference on the part of Dr. Mitcheff.

On November 5, 2007, just more than a week after Dr. Ross examined Boyd, he was examined by Dr. Dennis Lewton, the prison eye doctor. Defendants' Memorandum, p. 4. Dr. Lewton suspected that Boyd had a detached retina, and made an immediate referral for an outside ophthalmology exam. *Id*. Boyd was transferred that same day to Dr. Richard Lipman at Retina Associates. *Id*. Boyd had a procedure done that same day called a pneumatic retinoplexy and was told that he should return the next day for a follow-up exam. *Id*. The next day Boyd was taken again to Retina Associates where it was determined he had a possible cataract, which Dr. Lipman had told him was a possible risk of having a pneumatic retinoplexy. *Id*. He was prescribed eye drops called Quixin. When he returned to the prison, Nurse Brubaker prescribed the Quixin as recommended by Retina Associates. *Id*.; Brubaker Affidavit, ¶ 7. On November 7, Boyd was taken yet again to Retina Associates and Dr. Lipman determined that Boyd's retina was flat and his vision was improving. *Id*. On November 9, Retina Associates called the prison and said that Boyd should come in for another follow-up exam. At this point, defendant Harriet Woolever, the secretary in the prison medical office who was responsible for scheduling appointments for inmates, informed Retina Associates that the prison was unable to transfer

9

Boyd that day. *Id.* However, an appointment was scheduled for November 12 and Boyd was taken again to Retina Associates. That same day Boyd had another pneumatic retinoplexy, was prescribed Tylenol for pain, and returned to the prison. *Id.*; Defendants' Exhibit F. Boyd was taken to additional follow-up appointments at Retina Associates on November 13 and November 15. Also on November 15, Nurse Brubaker submitted a request for another ophthalmology exam. *Id.*, p. 6; Brubaker Affidavit, ¶ 8. Dr. Mitcheff suggested that Nurse Brubaker contact the prison eye doctor to see if he could conduct follow-up exams. *Id.*; Mitcheff Affidavit, ¶ 8. Dr. Lewton concluded that he was comfortable conducting follow-up exams onsite rather than transferring Boyd to Retina Associates. *Id.* On November 26, Harriet Woolover called Retina Associates and cancelled a previously scheduled appointment since Boyd was now being treated by Dr. Lewton. *Id.*; Mitcheff Affidavit, ¶ 8. Defendants point out that Woolever, in her capacity as medical secretary, "did not make the determination to cancel this appointment, but merely relayed the information." *Id*; Mitcheff Affidavit, ¶ 4.

Boyd apparently contends that Woolever was deliberately indifferent to his serious medical condition in that she cancelled an appointment with Retina Associates. His legal position with regard to Woolever is hazy at best. In his response brief, when he discusses the cancellation of his November 26 appointment with Retina Associates, he actually blames Mitcheff and Brubaker. He states that "defendants Mitcheff and Brubaker collectively agreed that Boyd's November 26, 2007 appointment was not medically necessary." Plaintiff's Response, p. 21. In any event, it is clear that as a matter of law he states no claim against Woolever. The undisputed facts reveal that she never examined or treated Boyd. She was a secretary in the prison medical department. She scheduled appointments, or cancelled them, at

the instruction of prison medical staff. For these reasons, summary judgment is proper as to defendant Woolever.

On December 11, Boyd was examined again my Dr. Lewton. Defendants' Memorandum, p. 6. Dr. Lewton submitted a request for another consultation at Retina Associates since Boyd was complaining of "flashers and floaters" in his eye. *Id*. The appointment was scheduled and Boyd was taken to Retina Associates three days later. *Id*. The doctor who examined him on that date recommended that Boyd follow-up with Dr. Lipman. *Id*., p. 7. On December 17, Boyd was examined by Nurse Brubaker, who renewed the medication for his dizziness, noted that his blood pressure should continue to be monitored, and submitted another request for a follow-up exam at Retina Associates. *Id*.; Brubaker Affidavit, ¶ 9. Boyd was taken to Retina Associates the very next day. During his exam that day, the examining physician, Dr. Wilson, referred Boyd to the Department of Ophthalmology at Indiana University in the next two to three days because he believed Boyd needed additional specialized surgery. *Id*.

On January 13, 2008, Dr. Ross examined Boyd in the Clinic and he once again complained of pain in his right eye. *Id*. The next day, Boyd was seen by Dr. Lewton, who noted that he needed to be sent for surgery. *Id*. On January 24, Boyd was examined in the prison Clinic by Dr. Akinbiyi, who determined that his retina was once again detached. *Id*. Four days later, Boyd was taken to the emergency room at St. Anthony Hospital. *Id*. The emergency room physician also determined that Boyd likely had another detached retina and referred him to the Wishard Memorial Hospital Ophthalmology Clinic, where he was seen on January 29. *Id*.; Defendants' Exhibit G, pp. 1 and 36 (records from Wishard Memorial). The physician at

11

Wishard also concluded that Boyd would need additional surgery. *Id*., p. 8. Boyd was taken to the Wishard Hospital Retina Clinic again on February 11 and February 19 for pre-operative exams and evaluations. *Id*. He had surgery on February 21, 2008, and returned to the prison. *Id*., p. 9. He had follow-up exams at Wishard on February 22 and March 10. *Id*. On June 23, 2008, Boyd was seen again at the eye clinic at Wishard, where it was determined that his retina was detached yet again and he would need additional surgery. *Id*., p. 9; Exhibit G, pp. 2-4, 7, and 11-16; Exhibit E, 86-87. Surgery was performed two days later. *Id*. Boyd had follow-up appointments at Wishard on June 26 and July 3. *Id*., p. 10. On July 15, 2008, Boyd was transferred from Westville to the Pendleton Correctional Facility. At that point, defendants Ross, Jordan, Brubaker, and Woolever were no longer responsible for administering health care or health services to Boyd. *Id*.

Boyd contends that Dr. Ross, Director of Nursing Deana Jordan, and Nurse Practitioner Barbara Brubaker were all deliberately indifferent to his medical needs. Boyd states that "the defendants, individually and collectively, are responsible for at least three (3) lengthy delays in providing Boyd timely and meaningful medical care regarding his right eye and the numerous retinal detachments and tears." The delays he refers to include the delay between October 16, 2007, when he claims he complained to confinement officers and an unnamed nurse about pain in his eye, and October 28 when he first relayed his complaints to Dr. Ross (as well as Dr. Ross's alleged failure to "deal with Boyd's eye condition as an emergency and [her decision] to refer Boyd to the on-site ophthalmologist, Dr. Dennis Lewton . . .; a delay in providing "immediate follow-up care afer it was determined on December 18, 2007, that the retina in [my] right eye had for a third time detached and required immediate (emergency) treatment in order to repair

12

it." Boyd states that he "did not receive the required medical care until February 21, 2008[.]" Finally, he claims that "on April 7, 2008, Boyd was scheduled for a post-op follow-up to his surgical procedure performed on February 21, 2008, however, the follow-up appointment was cancelled." Plaintiff's Memorandum, pp. 2-3. The Court has already explained that the delay between October 16 and October 28 of 2007 does not state a claim for deliberate indifference. December 18 was the date of Boyd's exam at Retina Associates when Dr. Wilson recommended that he be seen at Indiana University because he needed surgery. That is, of course, the surgery he ended up having on February 21, 2008. Boyd claims that Dr. Wilson's directive was that Boyd had to have surgery in two or three days. Thus, the delay between December 18, 2007, and February 21, 2008, constituted deliberate indifference to his medical needs. However, Dr. Wilson's recommendation does not state that Boyd needed surgery in two or three days, but rather that he should receive a surgical consult within that time. The precise wording of Dr. Wilson's recommendation was "please refer to Dept. of Ophthalmology, Indiana University, next 2-3 days. Needs surgery!!" Defendants' Exhibit E, p. 42. The recommendation does not state that the surgery needed to take place within two or three days, although that is how Boyd interprets it. While it is true he did not end up having surgery until February 21, 2008, the undisputed facts, as outlined above, show that he did receive medical attention for his eye problem on numerous occasions between December 18 and February 21. During that time he was seen by Dr. Ross, Dr. Akinbiyi, Nurse Brubaker, a physician at St. Anthony Hospital, and outside specialists at Wishard. Finally, as to the cancelled follow-up appointment on April 7, 2008, it is true that Boyd had a follow-up appointment at Wishard on March 10, 2008, was deemed to be doing well by the physician, and told to follow-up again in approximately four

13

weeks. The next follow-up at Wishard did not take place until June 23, 2008. Defendants' Memorandum, p. 9. However, in that span of time, Boyd was seen in the Chronic Care Center on April 30, May 5, and May 12. This included an examination by Dr. Lewton, the prison eye doctor, on May 5. *Id*. The Court finds that these alleged delays, which form the foundation of Boyd's complaint, were not incidents of deliberate indifference since he continued to receive medical care and attention during those times, even if it was not the level of care he now concludes was necessary.

After he was transferred to Pendleton, Boyd was seen by doctors and nurses at Pendleton on numerous occasions, and also received continuing care at Wishard over the course of many months. These many exams and appointments are listed in detail in defendants' memorandum at pages 10 through 13 and need not be repeated here.

Defendants argue that "[t]he course of Mr. Boyd's medical treatment for his eye condition was primarily determined by the specialists at Retina Associates and Wishard Hospital, and the prison eye doctor, Dr. Dennis Lewton. . . . The medical staff at the Westville Correctional Facility prescribed all of the medication and treatment recommended by the specialists at Retina Associates and Wishard Hospital. . . The medical care that Barbara Brubaker, Dr. Rachael Ross, and the nursing and physician staff at the Westville Correctional Facility and the Pendleton Correctional Facility rendered to Mr. Boyd was reasonable, appropriate, and within the applicable standard of care." Defendants' Memorandum, p. 13.

The Court has already explained its reasoning in granting summary judgment in favor of Dr. Mitcheff and secretary Harriet Woolever. The Court also finds that there is more than ample evidence that Dr. Ross provided an adequate level of care to Boyd during the time he was

incarcerated at Westville. The time line of events outlined above clearly demonstrates that Dr. Ross provided adequate care, arguably even a high level of care, to Boyd. She examined him often, treated him for high blood pressure, made and made numerous request for him to be seen by Dr. Lewton and outside physicians. The evidence does not support Boyd's claim that Ross was deliberately indifferent to his medical needs and summary judgment in favor of Dr. Ross is proper.

The same reasoning applies to Nurse Practitioner Brubaker, who followed the directives of Dr. Ross and the physicians from Retina Associates and Wishard Hospital. Like Dr. Ross, Brubaker examined Boyd on numerous occasions and prescribed medicine to treat him as directed by prison physicians and outside specialists. Summary judgment in favor of Brubaker is therefore proper.

As to Deana Jordan, the Director of Nursing at Westville, there is no evidence whatsoever to support any claim against her. As defendants point out, "[a]s Director of Nursing, Deana Jordan did not treat offenders, but supervised the nursing staff and their schedule." Defendants' Memorandum, p. 14 (citing Ross Affidavit, ¶ 11). Her "job duties included: scheduling nurses for shifts; handling human resources issue for the nurses; and reviewing random patient charts for quality control. . . . Deana Jordan had no personal involvement in Russell Boyd's medical care and she had no involvement with scheduling or sending him for medical appointments outside the prison." *Id*. Boyd presents no evidence to dispute these facts. In fact, he does not even claim that Jordan was involved in treating his eye condition or any other condition. Accordingly, he can state no claim against her and summary judgment in her favor is proper.

That leaves only one defendant–Correctional Medical Services, Inc. Boyd attempts to hold CMS liable based on the actions of its employees–Mitcheff, Ross, Brubaker, Jordan, and Woolever. Because the Court concludes that none of the individual defendants were deliberately indifferent to his serious medical needs, CMS cannot be held liable either. Boyd argues that "CMS, as a corporation, and an admitted government entity . . . failed to provide proper training (instruction) as to health care and administrative personnel employed or under contract at the Westville facility acting in compliance with those state statutory provisions regarding health care services to be provided to offenders within Indiana's correctional facilities. That CMS has additionally failed to have their health care and administrative level employees adhere to IDOC policies, procedures and health care directives which pertain to health care services to the incarcerated." Plaintiff's Response, p. 14. Boyd offers no specifics on which policies or procedures CMS violated or failed to have in place. But it doesn't matter. Since none of the individual defendants failed to provide him with adequate health care, CMS policies and procedures likewise did not fail him and summary judgment in favor of CMS is proper.

> The defendants sum up their argument as follows:
>
> While Plaintiff's medical care could have been timelier or more perfect, the simple undisputed fact is that Plaintiff received the medical care he needed. The sheer volume of medical care given to Mr. Boyd negates his deliberate indifference claim. During his year and three months at the Westville Correctional Facility, Mr. Boyd was seen by medical staff at least 26 times for his eye problems. In addition, Mr. Boyd was sent outside of the prison to Retina Associates 8 times, to Wishard Hospital 10 times, and once to St. Anthony Hospital. When Retina Associates and Wishard Hospital prescribed medicated eye drops, the prison medical providers prescribed that medication. The Defendants have presented expert medical testimony that the medical care rendered to Mr. Boyd was reasonable, appropriate and within the standard of care.

Defendants' Reply, docket at 110, pp. 6-7. The Court agrees with this argument. Whether Boyd

received the best possible care is not at issue. It is very unfortunate that Boyd had to endure such problems with his eye and had to undergo so many procedures and surgeries. The Court is not unsympathetic to his plight. But he has failed to carry his burden of establishing that the defendants in this case were deliberately indifferent to his medical needs. In fact, he received continual treatment from the defendants and from outside medical providers for nearly two years after he initially complained to Dr. Ross about his eye pain. Therefore, all of the defendants are entitled to summary judgment in their favor.

## CONCLUSION

For the reasons discussed above, the motion for summary judgment filed by defendants (docket at 80) is GRANTED and this case is DISMISSED.

Date: September 25, 2012.

    /s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana